# In the Iowa Supreme Court

No. 25–0044

Submitted January 20, 2026—Filed March 13, 2026

In the interest of **L.P.,** minor child.

**State of Iowa,**

Appellant,

**W.D.** and **T.D.,**

Intervenor-Appellants,

**D.S.** and **K.S.,**

Intervenor-Appellees.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Susan Cox, district associate judge.

The Iowa Department of Health and Human Services seeks further review of a court of appeals decision affirming a juvenile court dispositional order directing placement of a child with respite caregivers as fictive kin. **Decision of Court of Appeals Vacated; Juvenile Court Judgment Reversed and Case Remanded.**

Mansfield, J., delivered the opinion of the court, in which all justices joined. Christensen, C.J., filed a concurring opinion.

Brenna Bird, Attorney General, and Mackenzie Moran (argued) and Michelle R. Becker, Assistant Attorneys General, for appellant State of Iowa.

W.D. and T.D., West Des Moines, pro se, and Heidi M. Miller (until withdrawal) of The Law Office of Heidi Miller, Pleasantville, for intervenor-appellants W.D. and T.D.

Teresa Pope (argued) of Pope Law, PLLC, Des Moines, for intervenor-appellees D.S. and K.S.

Kimberly Graham, Polk County Attorney, and Lily E. Dayton, Assistant Polk County Attorney, for the Polk County Attorney's Office, Des Moines.

Jami J. Hagemeier and Erin Romar of Youth Law Center, Des Moines, and Lynn Vogan (until withdrawal) of Des Moines Juvenile Public Defender's Office, attorneys and guardians ad litem for the minor child.

**Mansfield, Justice.**

### I. Introduction.

American law has its share of verbal paradoxes where the modifier seems to undo the thing being modified: for example, "affirmative defense," "attractive nuisance," "qualified immunity," "quasi-contract," and "legislative court." In 2022, our legislature added a new term to this lexicon—"fictive kin." 2022 Iowa Acts ch. 1098, § 4 (codified at Iowa Code § 232.2(22) (2023)). Fictive kin are persons who aren't actually relatives but who have "an emotionally positive significant relationship with the child or the child's family." Iowa Code § 232.2(22) (2023). When a child has to be removed from the child's parents, fictive kin now have priority over all other nonrelative placements—including foster care. *Id.* §§ 232.78(8)(*a*), .95(2)(*c*), .102(1)(*a*). The question this case presents is whether this fictive-kin relationship needs to have predated the child's removal, in the same way that a person's status as a relative of the child ordinarily would.

We conclude from the overall wording and structure of the 2022 legislation that fictive kin are persons whose "emotionally positive significant relationship" with the child or the child's family existed *before removal,* as contrasted with foster parents whose relationship would normally develop *afterward.* 2022 Iowa Acts ch. 1098, § 4 (codified at Iowa Code § 232.2(22) (2023)). Accordingly, in the present case, we vacate the decision of the court of appeals and reverse the disposition and intervention orders of the juvenile court, all of which concluded otherwise. We instead find persuasive the reasoning of the court of appeals' dissent. We remand this case for further proceedings on the basis that the respite caregivers for the foster family do not qualify as fictive kin within the meaning of Iowa juvenile law.

**II. Facts and Procedural History.**

**A. L.P.'s Initial Removal and Placement.** L.P. was born in November 2023. Her mother tested positive for opiates at the hospital. The mother has a long history of substance abuse, mental health concerns, and involvement with the Iowa Department of Health and Human Services (HHS). Her parental rights to four other children had previously been terminated. Three days after L.P.'s birth, HHS removed the newborn from parental custody and filed a child-in-need-of-assistance (CINA) petition.

HHS immediately placed L.P. with a foster home. However, it was shortly before Thanksgiving, and the foster parents had plans to travel for the holiday. A mutual friend connected L.P.'s foster mother with the Smiths (pseudonym). With HHS's approval, they provided respite care to L.P. The Smiths were not licensed foster care providers but were seeking to adopt a child and had gone through adoption studies.

After the Thanksgiving holiday, with HHS's continued approval, the respite care continued. Ms. Smith, a former full-time school teacher who was now teaching only as a substitute, agreed to provide free day care at her home for L.P. five days a week. The Smiths also provided frequent overnight respite care.

About ten days after L.P.'s birth, HHS was able to obtain some information from L.P.'s mother about the child's four half-siblings. The mother explained that the oldest child had been adopted in Iowa and that the three younger children had been adopted in Illinois. However, the mother claimed not to know the names of the adoptive parents, the HHS worker was unable to reach others who might have information, and the Illinois Department of Children and Family Services did not return phone calls.[1]

---

[1]The putative father of L.P., who was named by L.P.'s mother, was never located.

On January 5, 2024, the juvenile court entered an order adjudicating L.P. in need of assistance and continuing her removal from parental custody. It was noted that the mother had tested positive for methamphetamine; the mother did not attend the hearing.[2] A dispositional hearing was scheduled for February 15.

**B. Intervention by the Respite Care Providers—The Smiths.** Later in January, the Smiths moved to intervene and to modify placement. They alleged that they were fictive kin within the meaning of chapter 232 and further alleged:

4. [The Smiths] have formed a relationship with [L.P.], essentially since she left the hospital, and have seen her, and provided care for her, nearly every day since.

5. [The Smiths] would like to be considered for placement of [L.P.] and would be willing to serve as a concurrent plan.

6. Fictive kin and suitable other placements are preferred to foster care.

7. The current foster home is not a concurrent plan, however, appears to be able to continue providing care for [L.P.].

8. It appears the Department is planning to move the child to a different foster home in the relatively near future.

9. [The Smiths] already have a relationship with [L.P.] and a move to a stranger's home would be traumatic to [L.P.] when there is an appropriate person available to provide such care, with whom the child has a relationship.

10. [The Smiths] request the Court set this matter for hearing and that pending hearing, enter an order prohibiting HHS from moving [L.P.] to a different foster home.

L.P.'s guardian at litem (GAL) supported the motion to intervene; HHS opposed it. At the hearing on the motion, HHS questioned the Smiths' legal interest in the matter. It pointed out that they were not licensed foster care parents. An HHS witness elaborated that HHS "would not consider daycare

---

[2]The mother did not attend any hearings after the removal hearing and did not take advantage of any services offered by HHS, including visitation with L.P.

providers per se, fictive kin, to a child that is so, so young." (L.P. was a little over two months old at the time of the hearing.) The witness added that it was "very early" in the case, and relatives were "still being sought and vetted for possible placement." The assistant county attorney admitted that he was "kind of thinking out loud" but had not settled in his mind whether a day care provider could be a fictive kin.

In arguing on behalf of the Smiths' motion, the GAL pointed out that L.P. had spent "a third of her very short life with the potential intervenors." The GAL considered that a "substantial interest." The GAL added that her position in the case might diverge from that of the Smiths in the future, and therefore it was important for the couple to have their own representation in the proceedings.

A few days later, the juvenile court entered an order finding that the Smiths were fictive kin and granting their motion to intervene. The Smiths' motion to modify placement was deferred to the dispositional hearing.

**C. Notification to the Adoptive Parents of L.P.'s Siblings.** Iowa Code section 232.84(2) provides that within thirty days after removal, HHS is to "exercise due diligence in identifying and providing notice to the . . . parents of the child's siblings." *See also In re R.B.*, 832 N.W.2d 375, 380 (Iowa Ct. App. 2013) ("The language places the onus on the department rather than the parents to identify relatives subject to notification."). Nonetheless, HHS was not able to locate the Olsons (pseudonym)—the Iowa adoptive parents of L.P.'s oldest half-sibling—until mid-February. The case manager later explained that she does not personally have access to adoption records, but on her supervisor's recommendation, she eventually reached out to an adoption worker within HHS.

Through meeting with the Olsons, HHS then learned of the adoptive parents of L.P's other three half-siblings—the Youngs (pseudonym)—who live in Illinois. HHS mailed them a relative notice.

The Olsons moved to intervene. They explained that their interest was "to have the child placed in their care, if necessary[,] and to ultimately adopt the child should parental rights be terminated." They noted that "[a]s former licensed foster parents, who have adopted [a] half-sibling of this child," they have "preferential treatment over fictive kin and foster care placement." The juvenile court granted their motion.

Meanwhile, the Youngs also expressed interest in having L.P. in their care. Because they lived in Illinois, HHS sought an expedited evaluation of their home under the Interstate Compact on the Placement of Children.

As these events were occurring, the juvenile court continued the dispositional hearing on L.P. several times, noting that there were "three families seeking placement of [L.P.]."

**D. Further Developments Before the Dispositional Hearing.** In May, the Smiths filed a motion for an "attachment assessment" under which a professional would evaluate L.P.'s attachment to them and report to the court. The Smiths proposed using court services funds for the assessment. Without waiting for HHS's response, the court granted the motion.

HHS sought reconsideration, noting that it was currently looking into relative placements and objecting to the cost of the assessment. The court thereupon withdrew its prior order, only to reinstate it when the Smiths volunteered to pay the expense. Yet nearly a month later, HHS had not signed the necessary consents for the attachment assessment as ordered by the court. The Smiths also became licensed foster parents in July.

A private agency completed the expedited home study in Illinois in June. The agency recommended that the Youngs be considered for placement of L.P. However, it took two additional months for the Illinois Department of Children and Family Services to sign off on the study and forward it to HHS in Iowa.

Both sets of sibling parents—the Olsons and the Youngs—participated in visitation. The Olsons saw L.P. in person regularly for three hours a week. Largely due to distance, the Youngs had mostly videoconference contacts and only a few in-person encounters with L.P.

On July 12, the attorney general's office entered an appearance for HHS. The county attorney remained in the case but no longer represented HHS pursuant to Iowa Code section 232.114(3). The juvenile court continued the dispositional hearing again, this time until November, and directed that "four attachment studies" be conducted—(1) for the foster parents, (2) for the Smiths, (3) for the Olsons, and (4) for the Youngs. The court also appointed a court-appointed special advocate (CASA).

Soon thereafter, a joint consultation took place concerning L.P. Present were the HHS caseworker, two HHS supervisors, the assistant attorney general now representing HHS, the GAL, and three therapists who had been involved with the child. All agreed that L.P. was doing very well under the current arrangements. However, HHS made clear that it "must make effort to place children with siblings" and "cannot recommend placement with the day care provider." HHS indicated that it "would give preference to the family in Illinois due to the fact that the siblings of [L.P.] whom they have adopted are younger, much closer in age to [L.P.]."

In August, HHS withdrew its request for the four attachment studies. Instead, having finally received the report on the Youngs in Illinois, HHS filed a

motion to modify placement, indicating its intent to place L.P. with her Illinois relatives. The court set this motion for consideration at the dispositional hearing.

**E. The Dispositional Hearing.** The dispositional hearing took place over two days in November. L.P. was by then just short of a year old. The assistant attorney general represented HHS at the hearing, but the county attorney's office also continued to participate. The court heard testimony from the HHS caseworker, the CASA, Ms. Smith, Ms. Olson, and the therapist who had performed the attachment assessment regarding the Smiths.

Three different placements were advocated at the dispositional hearing. HHS and the assistant attorney general recommended that L.P. be placed with the Illinois relatives, the Youngs. The Iowa relatives, the Olsons, sought placement for themselves. The respite caregivers, the Smiths, also requested placement of L.P. The Smiths' position was supported by the county attorney, the GAL, and the CASA.[3]

The HHS caseworker testified to her efforts in tracking down L.P.'s relatives and getting the home study on the Illinois relatives completed. As she put it, "[W]orking with Illinois is difficult." She also said she had no problem with the care provided by the Smiths; her recommendation in favor of the Youngs was simply based on "the law."

The CASA expressed the view that placing L.P. with relatives would be "just uprooting her, even if it is a slow transition, [and] would be the same as removing any other one-year-old from what they know all the time." As she put it, "I'm not an expert in trauma or moving kids, but that is just my concern, that we're moving people because we think we have to, not because it's in her best

---

[3]As noted, the mother had not been involved with L.P. since HHS's removal of the child. In the mother's absence, the mother's attorney took no position at the dispositional hearing regarding L.P.'s placement.

interest . . . ." The CASA also criticized the time it took HHS to reach out to L.P.'s relatives: "I don't want to say [the ball] was dropped, but it didn't keep dribbling." She commented that while the caseworker may not have had access to adoption records, "the duty is on HHS as a whole."

Ms. Smith testified regarding the care she was providing to L.P. In addition to keeping L.P. at her home every weekday, she had the child overnight often, sometimes three nights a week or more. In addition, Ms. Smith attended L.P.'s doctor's appointments. Ms. Smith also confirmed that she had become a licensed foster care provider in July. On cross-examination from the assistant attorney general, Ms. Smith admitted that what she provided would not technically be considered "respite care" because she had never been paid and the care she provided was much more extensive. *See* Iowa Admin. Code r. 441—156.8(7) ("Respite care for a child in family foster care shall be for up to 24 days per calendar year per placement.").

Ms. Olson testified that she and her husband have five adopted children in their home, including L.P.'s oldest half-sibling. She testified as to the positive connection between L.P. and herself and between L.P. and the oldest half-sibling. She acknowledged that Ms. Smith—not herself or the foster parent—normally transports L.P. to and from their home for visitation. She also acknowledged that there had not been intersibling contact between her family and the Illinois family prior to the commencement of this case.

**F. The Dispositional Order.** On December 27, the juvenile court entered its dispositional order. The court's order was highly critical of HHS. It concluded that HHS took too long to notify L.P.'s relatives despite having been previously involved with the four half-siblings. The court also concluded that "HHS has repeatedly demonstrated bias against [the Smiths], fictive kin, a potential

placement. This has included referring to [the Smiths] as 'baby stealers.' " As the court put it, "HHS has failed to fairly evaluate this placement and failed to focus on [L.P.]'s best interest." The court acknowledged the preference for placement with relatives in Iowa Code section 232.102. Still, it determined that HHS had "unreasonably or irresponsibly fail[ed] to discharge its duties" and that it was in L.P.'s "best interest to be placed with fictive kin, [the Smiths]," with whom L.P. had "established a primary attachment" since a few days after her birth. *See id.* § 232.102(1)(*b*)(2), (*c*). The court felt that L.P. would suffer "additional traumas" if removed from the existing foster family and the respite caregivers, the Smiths.

Thus, the juvenile court ordered that custody would remain with HHS but "for fictive kin placement—with [the Smiths]." The court also denied a motion for concurrent jurisdiction that would have allowed the Olsons to seek a guardianship of L.P.

**G. The Present Appeal.** HHS and the Olsons appealed the dispositional order. HHS also appealed the order granting the Smiths' motion to intervene. The Olsons appealed the denial of their motion for concurrent jurisdiction. We transferred the case to the court of appeals.

In a 2–1 panel decision, the court of appeals affirmed the juvenile court. The majority held, first, that the juvenile court correctly allowed the Smiths to intervene. In the majority's view, the Smiths' caregiving relationship with L.P. qualified them as fictive kin. And as fictive kin, they had a statutory interest in placement that they were entitled to protect by intervening.

Next, the court of appeals turned to the arguments that the juvenile court had erred in overriding the statutory preference for relative placement. *See id.* § 232.102(1). The court rejected HHS's argument that the statute requires the juvenile court to uphold any relative placement that would be suitable for the

child ahead of any other placement that is further down the priority list. Instead, it concluded that section 232.102(1)(*a*) contemplates a *comparison* of the potential placements and that section 232.102(1)(*c*) merely requires a specific finding that a nonrelative placement is in the child's best interests as compared with a relative placement.

Third, the court of appeals brushed back HHS's effort to contest the finding that it had acted "unreasonably or irresponsibly" within the meaning of section 232.102(1)(*b*)(2). The court concluded that this finding was unnecessary to the juvenile court's ruling and therefore didn't address it.[4]

The dissenting judge on the panel maintained that the Smiths did not qualify as fictive kin under Iowa Code section 232.2(22). In the dissent's view, persons who develop a relationship with a child or the child's family *only after* HHS has removed the child from parental custody cannot qualify as fictive kin. Therefore, in the dissent's view, the Smiths' motion to intervene should have been denied. Additionally, based on the statutory preferences in section 232.102(1)(*a*), the dissent would have reversed the juvenile court's order modifying placement in favor of the Smiths.

HHS sought further review, which we granted. In our order granting further review, we requested supplemental briefing on the following issue:

> Whether "fictive kin" as defined in Iowa Code section 232.2(22) may include foster parents, respite caregivers or other persons whose relationship with the child began only after the Department of Health and Human Services became involved with the child and she was removed from parental custody.

---

[4]The court of appeals also affirmed the juvenile court's denial of the Olsons' motion for concurrent jurisdiction and found that error was not preserved on HHS's argument that the juvenile court should not have ordered an attachment assessment for the Smiths.

**III. Standard of Review.**

We review a juvenile court's order on a motion to intervene "for correction of errors at law, giving some deference to the district court's discretion." *In re A.G.*, 558 N.W.2d 400, 403 (Iowa 1997). We review issues of statutory interpretation for correction of errors at law. *Iowa Dep't of Health & Hum. Servs. v. Iowa Dist. Ct.*, 27 N.W.3d 76, 82 (Iowa 2025). "We generally review CINA proceedings and termination of parental rights proceedings de novo." *In re J.C.*, 857 N.W.2d 495, 500 (Iowa 2014). "As always, our fundamental concern is the child's best interests." *Id.*

**IV. Analysis.**

**A. The Meaning of Fictive Kin.** We will first address whether the Smiths qualify as fictive kin under chapter 232, because we believe that this important point dictates the resolution of this appeal.[5]

1. *The 2022 legislation.* The general assembly amended chapter 232 in 2022 to add fictive kin to the types of relationships recognized by the juvenile court system. 2022 Iowa Acts ch. 1098, § 4 (codified at Iowa Code § 232.2(22) (2023)). Fictive kin is "an adult person who is not a relative of a child but who has an emotionally positive significant relationship with the child or the child's family." Iowa Code § 232.2(22). This addition was part of a broader revision of chapter 232 codifying a preference for relative placement. Thus, the same

---

[5]The Smiths contend that error was not preserved on this issue. We disagree. The motion to intervene turned on whether the Smiths had a legally protectible interest. *See* Iowa R. Civ. P. 1.407(1)(*b*). At the hearing, the assistant county attorney resisted intervention on the ground that the respite caregivers did not have a sufficient legal interest in the proceedings. Although he wondered aloud—without taking a definitive position—on whether a day care provider could be fictive kin, he also offered an HHS witness when the juvenile court asked for elaboration and the witness made clear that HHS would not consider a day care provider in this circumstance fictive kin. The court then made a specific finding that the Smiths "meet the statutory definition of fictive kin" in granting intervention while acknowledging HHS's resistance to the motion.

legislation also modified the rules of construction for chapter 232. Previously, the initial section of that chapter had read:

> This chapter shall be liberally construed to the end that each child under the jurisdiction of the court shall receive, preferably in the child's own home, the care, guidance and control that will best serve the child's welfare and the best interest of the state. When a child is removed from the control of the child's parents, the court shall secure for the child care as nearly as possible equivalent to that which should have been given by the parents.

Iowa Code § 232.1 (2021).

> The 2022 legislation recast this provision as follows:

> This chapter shall be liberally construed to the end that each child under the jurisdiction of the court shall receive, preferably in the child's own home, the care, guidance and control that will best serve the child's welfare and the best interest of the state. When a child is removed from the control of the child's parents, the court shall secure the least restrictive care for the ~~child care as nearly as possible equivalent to that which should have been given by the parents~~ child's placement with a preference for placement with the child's family or a fictive kin.

*See* 2022 Iowa Acts ch. 1098, § 1 (codified at Iowa Code § 232.1 (2023)).

In addition, the 2022 legislation inserted an order of placement preference in section 232.102, the provision covering dispositional hearings. *Id.* § 45 (codified at Iowa Code § 232.102 (2023)). Adult relatives are the first preference, fictive kin come second, and then other categories follow:

> 1. *a.* After a dispositional hearing, the court may enter an order transferring the legal custody of the child to a parent of the child. If the court finds that custody with either of the child's parents is not in the child's best interests, the child's custody shall be transferred to the department for placement of the child in any of the following categories in the following order of priority:

> (1) An adult relative of the child including but not limited to adult siblings and parents of siblings.

> (2) A fictive kin.

(3) Any other suitable placement identified by the child's relatives.

(4) An individual licensed to provide foster care pursuant to chapter 237. If the child is placed with a licensed foster care provider, the department shall assign decision-making authority to the foster care provider for the purpose of applying the reasonable and prudent parent standard during the child's placement.

(5) A group care facility, shelter care facility, or other residential treatment facility.

*b.* (1) If the court places custody of the child with the department pursuant to paragraph "*a*", the court may identify a category listed in paragraph "*a*" for placement of the child, but the department shall have the authority to select the specific person or facility within that category for placement, subject to court review at the request of an interested party.

(2) The court shall give deference to the department's decision for placement of a child. A party opposed to the department's placement of a child shall have the burden to prove the department failed to act in the child's best interests by unreasonably or irresponsibly failing to discharge its duties in selecting a suitable placement for the child.

*c.* A court shall not order placement of a child in a category identified in paragraph "*a*", subparagraph (2), (3), (4), or (5) without a specific finding that placement with an adult relative is not in the child's best interests and providing reasons for the court's finding.

*Id.* (codified at Iowa Code § 232.102(1)(*a*)–(*c*) (2023)).

Under the 2022 legislation, the preference for placement with relatives or, secondarily, fictive kin extends to every phase of placement, not just the dispositional hearing. According to section 232.78 as amended in 2022, following temporary parental removal, custody is transferred to HHS for placement in the same five-step order of priority, with "fictive kin" coming right after "[a]n adult relative of the child." Iowa Code § 232.78(8)(*a*) (2023); *see also id.* § 232.95(2)(*c*) (requiring the same five-step priority to be followed at the hearing to determine whether temporary removal should be continued). In an emergency situation,

when "[t]here is not enough time to apply for an order under section 232.78," a peace officer or juvenile court officer shall "[m]ake every reasonable effort to place the child with an adult relative or a fictive kin of the child." *Id.* § 232.79(1)(*b*), (2)(*c*). And the same five-step priority also applies to orders entered following termination of parental rights. *See id.* § 232.117(3); *see also id.* § 237.22(3) (requiring the agency responsible for the placement of the child to create a case permanency plan that includes "[t]he efforts to place the child with a relative or fictive kin").[6]

State foster care systems receive significant funding from the federal government through Title IV-E of the Social Security Act. *See* 42 U.S.C. §§ 670–679c. This funding comes with strings attached. *See id.* § 671. For instance, in order for a state to be eligible for federal payments, it must have an approved statewide plan that "provides that the State shall consider giving preference to an adult relative over a non-related caregiver when determining placement for a child." *Id.* § 671(*a*)(19); *see also In re N.V.*, 877 N.W.2d 146, 152 (Iowa Ct. App. 2016) (quoting this language as illustrating "a statutory preference for placement of children with relatives during the child-in-need-of-assistance phase of the proceedings").

The federal preference for relative placement over foster placement received additional bolstering when Congress passed the 2018 Family First Prevention Services Act (FFPSA). Bipartisan Budget Act of 2018, Pub. L. No. 115–

---

[6]For a contrast with prior law, consider *In re K.D.*, 975 N.W.2d 310 (Iowa 2022), decided before the 2022 legislation went into effect. There we reversed an order removing children from their stepgrandmother. *Id.* at 313. We "recognize[d] that our current statute does not mandate a preference for relative placement after the termination of parental rights." *Id.* at 325. But we found it "troubling that DHS took virtually no effort to maintain the children's relative placement or attempt to determine another relative placement given [federal law]'s emphasis on improving outcomes for children removed from their home by prioritizing relative or fictive kin placements." *Id.*

123, §§ 50701–82, 132 Stat. 64, 232–69 (codified in scattered sections of 42 U.S.C.). The stated purpose of FFPSA was "to provide enhanced support to children and families and prevent foster care placements" by making certain services available. *Id.* § 50702, 83 Stat. at 232 (codified at 42 U.S.C. § 622) (statement of purpose). For example, FFPSA now permits states to use federal funding to provide services to foster care candidates who "can remain safely at home or in a kinship placement." *Id.* § 50711, 132 Stat. at 233 (codified at 42 U.S.C. § 671(e)(2)(A)); *see also* Josh Gupta-Kagan, *America's Hidden Foster Care System*, 72 Stan. L. Rev. 841, 894–96 (2020) (providing an overview of FFPSA). When using FFPSA funds for a child who is a candidate for foster care, the state must maintain a "written prevention plan" for the child. Pub. L. No. 115–123, § 50711, 132 Stat. at 233 (codified at 42 U.S.C. § 671(e)(4)(A)). The plan must "identify the foster care prevention strategy for the child so that the child may remain safely at home, live temporarily with a kin caregiver until reunification can be safely achieved, or live permanently with a kin caregiver." *Id.*, 132 Stat. at 233 (codified at 42 U.S.C. § 671(e)(4)(A)(i)(I)). FFPSA, in short, was enacted to "reduce the number of children in foster care and shift the focus of our child welfare system from the removal of children to the preservation of families." Caitlyn Garcia, *Replacing Foster Care with Family Care: The Family First Prevention Services Act of 2018*, 53 Fam. L.Q. 27, 28 (2019).

Our 2022 legislation was adopted to bring Iowa's juvenile law more in line with the foregoing federal directives. Thus, in an official statement accompanying what became the 2022 legislation, HHS explained that "[t]he proposed revisions are intended to align Chapter 232 with [FFPSA], with additional federal regulations, and with case law as well as to create consistency throughout the various sections of 232 and to assist in clarifying roles." H.F. 2507, 89th G.A.,

2d Sess., department's memorandum, at 1 (Iowa 2022), https://www.legis.iowa.gov/docs/publications/bgs/81703_5240XD_background_statement.pdf [https://perma.cc/3TF5-3RFW]. HHS elaborated,

> When a child is removed from the home and placed in out-of-home ca[r]e, <u>relatives should be the preferred placement because such placement maintains the child's connections with his/her family, consistent with [FFPSA]</u>. Federal law under Title IV-E of the Social Security Act requires that the state consider giving preference to an adult relative over a nonrelated caregiver when determining a placement for the child, provided that the relative caregiver meets all relevant state child protection standards. First consideration must be [the] child's other parent, then adult relative and fictive kin, before transferring to [HHS] or [juvenile court services] for appropriate placement.

*Id.* at 2–3; *see also id.* at 1 ("Under [FFPSA], when a child must be removed from their home to ensure safety, placement priority should be given to a relative or fictive kin.").

FFPSA—unlike our post-2022 chapter 232—does not use the term "fictive kin." But it does refer to "kin caregiver." *See, e.g.,* 42 U.S.C. § 671(e)(4)(A)(i)(I). Kin caregiver is not defined but appears broad enough to cover a caregiver who is technically not a relative.[7] In addition, guidance from the Children's Bureau within the United States Department of Health and Human Services has encouraged states to "define the term 'relative' broadly to include Tribal kin, extended family and friends, or other 'fictive kin.'" Memorandum from the Child.'s Bureau, U.S. Dep't of Health & Hum. Servs., to State & Tribal Agencies Administering or Supervising the Admin. of Title IV-E of the Soc. Sec. Act 8 (Dec. 29, 2020). Other guidance gives state agencies flexibility in defining "relative." *See* Child.'s Bureau, U.S. Dep't of Health & Hum. Servs., *Child Welfare Policy Manual* § 8.3A.11, at 330 (2024) ("[T]he Children's Bureau will accept . . . a plan

---

[7]Otherwise, why not use the more precise term "relative caregiver"?

that limits the term to include biological and legal familial ties or a plan that more broadly includes Tribal kin, extended family and friends, or other 'fictive kin.' ").

2. *Interpreting the term.* As noted, Iowa juvenile law gives a high degree of priority in placement to fictive kin, whom it defines as "an adult person who is not a relative of a child but who has an emotionally positive significant relationship with the child or the child's family." Iowa Code § 232.2(22). At first blush, this definition would seem to embrace the Smiths. The juvenile court found that they have "an emotionally positive significant relationship" with L.P.

But we read statutes as a whole and in context. *See City of Davenport v. Off. of Auditor*, 28 N.W.3d 584, 594 (Iowa 2025) ("[W]e do not consider statutory language piecemeal."); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012) [hereinafter Scalia & Garner, *Reading Law*] ("Context is a primary determinant of meaning. A legal instrument typically contains many interrelated parts that make up the whole."). The definition in section 232.2(22) does not say *when* the person's significant relationship with the child or the child's family has to have existed. And to fill in that gap, we examine context.

We used such a contextual approach to resolve a similar question of timing in *Iowa Department of Human Services v. Lohman* (*In re Estate of Melby*), 841 N.W.2d 867, 874–77 (Iowa 2014). The issue there was when a debt is created under Iowa Code section 249A.5(2) (2011), part of Iowa's Medicaid recovery statute. *Lohman*, 841 N.W.2d at 874–77. The statute provides that

> [t]he provision of medical assistance to an individual who is fifty-five years of age or older . . . creates a debt due the department from the individual's estate for all medical assistance provided on the individual's behalf, upon the individual's death.

*Id.* at 874 (alteration and omission in original) (quoting Iowa Code § 249A.5(2)). On its face, this language might suggest that the debt is created upon the individual's death. But after considering the Medicaid recovery statute as a whole and its overall operation, we concluded that "section 249A.5(2) establishes a debt owed by the recipient of medical services when the services are provided, while mandating the department will refrain from collecting that debt until the death of the recipient." *Id.* at 877.

In placement priority, fictive kin stand behind only adult relatives and well ahead of licensed foster parents. But presumably *most* foster parents develop "an emotionally positive significant relationship" with the children they are caring for; that is largely why they choose to make the sacrifice to become foster parents. So the relationship with the child or the child's family logically should be one that existed *before* the chapter 232 proceedings began. Otherwise, the distinction between fictive kin and foster parents would erode away. Any foster parent would be able to elevate their placement priority simply by arguing they were fictive kin. Instead of serving its stated purpose of reducing reliance on foster care, the 2022 legislation would then have the opposite effect.[8]

Here, no one contested that an emotionally positive significant relationship existed between the Smiths and L.P. by the time of the dispositional hearing, when L.P. was thirteen months old. Yet the couple were actually another step

---

[8]As the court of appeals has said,

> The foster care system is designed to provide temporary, not permanent, homes for children. This is to facilitate the goals of reunification with the parents or placement in a relative's home. We certainly recognize the bond that is developed between a foster parent and child. We also recognize that a bond between the foster parents and the child signifies a good foster home. However, if every foster parent who formed a bond with a child were given enforceable rights to the children, it would upset the goals of the system.

*In re E.G.*, 745 N.W.2d 741, 744 (Iowa Ct. App. 2007).

removed from foster parent status. They were respite caregivers for the foster parents.

Furthermore, while the legislature can act as its own lexicographer, and has acted in that role here, we can look at the words being defined to the extent the legislature's definition is ambiguous. *Porter v. Harden*, 891 N.W.2d 420, 427 (Iowa 2017); *see also State v. Ross*, 941 N.W.2d 341, 347–48 (Iowa 2020); Scalia & Garner, *Reading Law* 232 ("[T]he word being defined is the most significant element of the definition's context. The normal sense of that word and its associations bear significantly on the meaning of ambiguous words or phrases in the definition."). Given that the definition in Iowa Code section 232.2(22) (2023) doesn't say when the relationship has to have existed, we can consider the generally recognized meaning of the term "fictive kin" to help resolve that open issue.

"Fictive kin" sounds like someone who would be *like* kin, such as the Tribal kin, extended family, and friends referenced in the federal guidance. They would not be someone who was a stranger to the child and the child's family before HHS stepped in. And indeed, that is the recognized meaning of the term in sociology. According to one reference work, "fictive kin" is the term used "to describe relationships between people who are regarded as if they are family, but where there are no blood or legal ties . . . . Scholars thus often distinguish between 'conventional kin,' the relatives obtained through marriage, adoption, or blood, and 'fictive kin,' those individuals who enact family-like roles." Margaret K. Nelson, *Fictive Kin, in* 2 *The Wiley Blackwell Encyclopedia of Family Studies* 851 (Constance L. Shehan ed., 2016).

Another encyclopedia defines "fictive kin" as "the informal adoption of close friends into one's family." Denae Johnson, *Fictive Kin, in The Wiley Blackwell*

*Encyclopedia of Sociology* (George Ritzer, Chris Rojek & Michael Ryan eds., 2013). Regarding the term's relation to traditional family, it notes that fictive kin "persists as a form of extended kin and as a means of pooling resources, extending familial networks, and extending social support." *Id.* Finally, a third reference work notes that fictive kin are often "assigned and referred to by a kin term" and that they "behave and [are] treated like a member of the family." David Levinson, *Kinship, in* 2 *Encyclopedia of Community: From the Village to the Virtual World* 820 (Karen Christensen & David Levinson eds., 2003). These definitions refer to family-like persons whose connection to the family preceded any intervention by the government.

Moreover, the 2022 amendments also amended parts of chapter 237 dealing with foster care review. The same definition of fictive kin was added. 2022 Iowa Acts ch. 1055, § 2 (codified at Iowa Code § 237.15(5) (2023)). Simultaneously, the legislation amended section 237.20 to require review of the "[t]he efforts of the agency responsible for the placement of the child to locate and provide services to the child's biological or adoptive parents, legal guardians, *or fictive kin* providing the majority of a child's daily food, lodging, and support." *Id.* § 8 (codified at Iowa Code § 237.20(1)(*a*)(2)) (emphasis added). This language distinguishes foster parents from persons who had a prior role in the child's life—and puts fictive kin in the latter category.

Going further, in 2025, new legislative amendments to chapter 237 introduced the same term "fictive kin" with the same definition to the first part of that chapter. 2025 Iowa Acts ch. 135, § 12 (to be codified at Iowa Code § 237.1(10) (2026)). The statement of purpose in chapter 237 now reads:

> It is the policy of this state to provide appropriate protection for children who are separated from the direct personal care of their parents, relatives, <u>fictive kin,</u> or guardians and, as a result, are

> subject to difficulty in achieving appropriate physical, mental, emotional, educational, or social development. This chapter shall be construed and administered to further that policy by assuring that child foster care is adequately provided by competently staffed and well-equipped child foster care facilities, including but not limited to residential treatment centers, group homes, and foster family homes.

*Id.* § 13 (to be codified at Iowa Code § 237.2 (2026)). This statement—like post-2022 section 237.20—appears to draw a line between the people from whom the child may become separated upon HHS involvement, including fictive kin, and the subsequent foster care that a child may then receive.

In addition, other state courts grappling with the concept of "fictive kin" under their own juvenile laws have come to similar conclusions regarding the meaning of the term. *See In re Gilland*, No. 373612, 2025 WL 3561458, at *4 (Mich. Ct. App. Dec. 11, 2025) (per curiam) ("[T]he foster parents were strangers to the seven-year-old child and to respondent when the child was placed with them, so they were not 'fictive kin.' "); *Clark Cnty. Dep't of Fam. Servs. v. Eighth Jud. Dist. Ct.* (*In re J.B.*), 550 P.3d 333, 338 (Nev. 2024) (en banc) ("Prospective custodians who have a connection with the family and demonstrate a commitment and willingness to care for the infant can qualify as fictive kin . . . ."); *In re Tex. Dep't of Fam. & Protective Servs.*, No. 10–25–00135–CV, 2025 WL 1766132, at *1 n.1 (Tex. App. June 26, 2025) ("Fictive kin or kinship care refers to the care of a child by relatives or close family friends."). The proposed Restatement of the Law: Children and the Law also uses the term "fictive kin" to mean someone who has a prior relationship with the child or the child's family:

> [T]he significant relationship can be between the child and the fictive kin or the child's family and the fictive kin. *The latter situation is especially important when the child is very young and will not have had an opportunity to establish a relationship with*

*the fictive kin. Fictive kin provide the advantages of care by a relative: the person is a connection between the child and the child's family, and the person will know and understand the family's values and routines.* Both provide continuity and stability to the child.

Restatement of the L.: Child. & the L. § 2.45 cmt. *d* (A.L.I., Tentative Draft No. 6, 2024) (emphasis added).

A newborn enters the world with only one set of relationships—those of birth. With an absent father and removed from her mother's care at birth, L.P. had not yet developed a social world beyond her birth. In that circumstance, fictive kin cannot be created by contact with L.P. alone but must arise, if at all, through an established connection to her family. Where no relationship with L.P.'s family is claimed, reliance on postremoval care places the focus on the wrong relationship and misunderstands the nature of fictive kin.

In sum, we find that the Smiths were not fictive kin and we echo the following observations of the dissenting judge on the court of appeals panel:

> But the relationship between the [Smiths] and L.P. was nonexistent before the removal. The relationship developed only after the department was involved, like every potential foster care placement that provides meaningful care to Iowa's most vulnerable children. Under the district court's analysis, nearly every foster parent could become fictive kin and be permitted party status.

**B. Resolving this Appeal.** Because the Smiths were not fictive kin, we conclude that the district court erred in permitting them to intervene. As respite care providers, they did not have a protectible legal interest in the proceeding under Iowa Rule of Civil Procedure 1.407(1)(*b*). Nor did they articulate a basis under which permissive intervention under rule 1.407(2) would have been appropriate. We vacate the order allowing them to intervene.

In addition, because the Smiths were not fictive kin, the district court's dispositional order must be reversed and remanded for further consideration. Everyone agreed that there were three appropriate, loving homes that could care

for L.P.—the Youngs in Illinois, the Olsons in Iowa, and the Smiths also in Iowa. The Smiths prevailed because the juvenile court concluded that they were in second position on the section 232.102(1)(*a*) priority list, and it was in L.P.'s best interests not to be dislodged from their care. But under our reading of the law, the Smiths were not fictive kin. The juvenile court erred in directing placement of L.P. with them on the basis that they were fictive kin. We reverse the dispositional order and remand for further proceedings.

On remand, the juvenile court will need to reapply section 232.102(1). Setting aside the court of appeals' interpretation of "fictive kin," we generally agree with its reading of section 232.102(1). When HHS has custody of the child, section 232.102(1) authorizes the court to determine the *category* for placement of the child—i.e., adult relative, fictive kin, any other suitable person identified by the child's relatives, licensed foster care provider, or group care facility. *See* Iowa Code § 232.102(1)(*b*)(1). HHS, however, has the authority to select "the *specific person or facility* within that category for placement," subject to court review. *Id.* (emphasis added).

The following subparagraph, section 232.102(1)(*b*)(2), relates to challenging HHS's placement decision within a category and imposes a significant burden of proof. Specifically, it indicates that "[a] party opposed to [HHS's] placement of a child shall have the burden to prove the department failed to act in the child's best interests by unreasonably or irresponsibly failing to discharge its duties in selecting a suitable placement for the child." *Id.* § 232.102(1)(*b*)(2). That paragraph does not come into play, though, when reviewing a determination of category by *the court* under section 232.102(1)(*b*)(1).

Still, the court must comply with the legislature's directives in entering the dispositional order. First, it must "make the least restrictive disposition

appropriate considering all the circumstances of the case," on the basis that the dispositions in section 232.102(1)(*a*) are "listed . . . in order from least to most restrictive." *Id.* § 232.99(4). Second, the court may not order placement in a nonrelative category "without a specific finding that placement with an adult relative is not in the child's best interests and providing reasons for the court's finding." *Id.* § 232.102(1)(*c*).

In *Iowa Department of Health & Human Services v. Iowa District Court*, for example, we recently applied sections 232.102(1)(*b*)(1), 232.102(1)(*b*)(2), and 232.108(1) in a case where a child and her siblings had been removed from parental custody with custody transferred to HHS. 27 N.W.3d at 78–79, 83–84. HHS originally placed the child with a different foster family from her siblings. *Id.* at 79. Approximately a year and a half later, HHS tried to move the child to the same foster home as her siblings. *Id.* at 80. The GAL opposed the move, pointing out that the current foster home was "the only home she has ever known." *Id.* at 80–81. The juvenile court ordered that the child remain in her current placement pending an evidentiary hearing, and we upheld that order. *Id.* at 81, 85. We reasoned that the review requested by a party under section 232.102(1)(*b*)(1) was appropriate and could occur before the child was actually moved. *Id.* at 85. At the same time, we noted that the GAL would have to prove that HHS had "unreasonably or irresponsibly fail[ed] to discharge its duties in selecting a suitable placement for the child." *Id.* at 83 (quoting Iowa Code § 232.102(1)(*b*)(2)).

Our decision in this case does not minimize the importance of the care that the Smiths have provided to L.P. They stepped in when L.P. was just a few days old and provided care when the designated foster family was unavailable.

And they have continued to be present to her. We decide only that the Smiths are not "fictive kin" within the meaning of Iowa law.

### V. Conclusion.

For the foregoing reasons, we vacate the decision of the court of appeals, reverse the intervention and disposition orders of the juvenile court, and remand for further proceedings.[9]

**Decision of Court of Appeals Vacated; Juvenile Court Judgment Reversed and Case Remanded.**

All justices join this opinion. Christensen, C.J., files a concurring opinion.

---

[9]We do not address the Olsons' contention that the juvenile court erred in denying their motion for concurrent jurisdiction. That motion may be reurged and reconsidered on remand.

**Christensen, Chief Justice (concurring).**

HHS is not an adoption agency. In the child welfare system, it exists first and foremost to strengthen families and keep them together through meaningful services and support whenever possible. Adoption is not the starting point, but a last resort reached only after reasonable efforts have been exhausted and proven unsuccessful. When that structure is not followed, the consequences are profound. This case, now delayed for months in the appellate process because of fundamental errors below, illustrates the cost of short-circuiting Iowa's child welfare framework—and reinforces why juvenile courts must ensure a child's case begins with sincere attempts to achieve family preservation, not adoption.

I join the majority in full but write separately to underscore how permanency for L.P. could—and should—have been achieved much sooner. Although the issues surrounding reasonable efforts and the absence of any waiver were neither raised nor decided below, they warrant discussion here so that the juvenile court does not make the same mistakes again on remand. The issues I raise here reveal a fundamental misstep in the juvenile court's approach. In focusing narrowly on one path forward, the juvenile court lost sight of the broader statutory framework designed to move cases efficiently and lawfully toward permanency.

**Removal and Adjudication:** L.P. was removed from Mom's care on November 20, 2023, when she was just three days old, and placed in HHS's custody for foster care. On January 6, 2024, the juvenile court adjudicated L.P. to be a child in need of assistance (CINA). In this order, the juvenile court noted Mom's parental rights to another child were terminated in 2018, and another of Mom's children was believed to be in a guardianship.

At the time, like most CINA proceedings, the initial permanency goal was reunification. However, the juvenile court ordered no reasonable efforts for Mom to work towards that goal. Reasonable efforts are "the efforts made to preserve and unify a family prior to the out-of-home placement of a child in foster care or to eliminate the need for removal of the child or make it possible for the child to safely return to the family's home." Iowa Code § 232.102A(1)(*a*) (2023). They exist under federal and state law to protect parents' constitutional right and liberty interest "in the care, custody, and control of their children." *G.Y. v. S.W.* (*In re Guardianship of L.Y.*), 968 N.W.2d 882, 894 (Iowa 2022) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)); *see also In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000) (en banc) (discussing the state and federal development of reasonable efforts laws). "The State must show reasonable efforts as a part of its ultimate proof the child cannot be safely returned to the care of a parent," so whether it made these efforts is critical to any decision to terminate parental rights. *In re L.M.*, 904 N.W.2d 835, 839 (Iowa 2017) (quoting *In re C.B.*, 611 N.W.2d at 493).

In its adjudication order entered when L.P. was only seven weeks old, this is all the juvenile court said about reunification with Mom:

5. Reasonable efforts **have** been made to prevent the need for removal of the child from the home; **these services include:** The mother was previously involved with DHHS. She has prior CPA's, prior extensive child in need of assistance case services, prior relative placement and guardianship of another child, and drug testing from the hospital.

6. The Court has inquired of the parties as to the sufficiency of services being provided and whether additional services are needed to facilitate the safe return of the child to the home and finds that the following services shall be offered:

With the exception of drug testing from the hospital, the only other reasonable efforts listed in paragraph five above involve Mom's past interactions with HHS for reunification with *other children* not at issue in the pending case. None of them focus on what reasonable efforts could be made in this case to

reunify Mom with L.P. Paragraph six is perhaps the most glaring indicator of the juvenile court's failure to order any reasonable efforts for reunification in this matter. Regardless of what a parent actually requests for services, and knowing the circumstances that led L.P. to the attention of HHS, it is common for such an order to include services like mental health evaluation and treatment, substance abuse evaluation and treatment, random drug screening, parenting classes, and family-centered services. Nevertheless, the juvenile court left the space after the colon completely bare: "[T]he following services shall be offered:" is followed by no words at all. Just white space.

In addition to listing no services in paragraph six, the next page of the same order includes reference to the same white space in its decretal language:

> 5. Pending the dispositional hearing scheduled above, the following shall occur: **see services set forth in paragraph 6 of the above findings.**

Ordering no services while awaiting disposition is concerning in any case. Here, it is alarming. As discussed below, the dispositional hearing did not occur for nearly a year. For an infant, a year is not just time on a calendar—it is a lifetime of firsts.

**Motion to Intervene and Fictive Kin Designation:** On January 19, a mere thirteen days after L.P. was adjudicated, the Smiths,[10] her daycare providers, filed a motion to intervene, asking the juvenile court to prohibit HHS from moving L.P. to a different foster home because they wanted to be considered a concurrent plan for adoption. On February 2, the juvenile court granted this motion over the State's objection and declared them "fictive kin" to L.P. At the time, the Smiths were not even licensed foster parents and had only started the

---

[10]I use the same pseudonyms as the majority.

home study process with HHS to be considered a concurrent placement for L.P. For the reasons stated in the majority opinion, deeming the Smiths fictive kin and sustaining their motion to intervene was where the wheels began to fall off the bus in this case. And it significantly contributed to the delay in achieving L.P.'s permanency.

**Disposition:** After months of motions and continuances—in large part to accommodate the Smiths' desire for an attachment assessment to support their quest to adopt L.P.[11]—the juvenile court finally conducted a dispositional hearing in November 2024, just shy of L.P.'s first birthday. This delay was egregious[12] because dispositional hearings exist to examine the sufficiency of the services that HHS is providing. Iowa Code section 232.99(3) governing these hearings states,

> In the initial dispositional hearing, any hearing held under section 232.103, and any dispositional review or permanency hearing, the court shall inquire of the parties as to the sufficiency of the services being provided and whether additional services are needed to facilitate the safe return of the child to the child's home. If the court determines such services are needed, the court shall order the services to be provided. The court shall advise the parties that failure to identify a deficiency in services or to request additional services may preclude the party from challenging the sufficiency of the services in a termination of parent-child relationship proceeding.

When the juvenile court entered its dispositional order in December 2024, the only reference to HHS's involvement with Mom was an indirect note of the HHS worker's testimony that "HHS's last contact with the mother was December

---

[11]It bears repeating what the majority has already noted: the juvenile court initially granted the daycare providers' motion for an attachment assessment without allowing HHS an opportunity to file a response, all while HHS consistently stressed to the juvenile court that its focus was on placing L.P. with her half-siblings.

[12]The juvenile court did not complete the dispositional hearing until approximately ten months after the CINA adjudication. Whether that meets the mandate for the juvenile court to hold a dispositional hearing "as soon as practicable" following the entry of the CINA adjudication order is open to interpretation. Iowa Code § 232.99(1).

2023." The juvenile court ordered "HHS [to] immediately make reasonable efforts to try and locate [the] named putative father and conduct paternity testing," but made no mention of services for reunification. It is clear from a review of this thirty-one-page dispositional order that the juvenile court was hyper-focused on finalizing a placement for L.P. outside of Mom's home even though the juvenile court had yet to conduct a permanency hearing or change the permanency goal from reunification to adoption.[13]

In its dispositional order, the juvenile court suggested HHS was "delay[ing] this case" because of bias against the Smiths, and it characterized the assigned worker's testimony as "disingenuous." The record does not support those accusations. The court's concerns focused on the time HHS took to notify and assess relatives. But that timeframe was not unreasonable under ordinary child welfare practice. It appeared excessive only because the court had already shifted its attention from reunification to adoption. By bypassing the reunification efforts that typically occupy the early months of the case, the court compressed the timeline and then faulted the agency for not moving faster toward relative placement.

Regarding those efforts to notify relatives, the record shows HHS workers began searching through Mom's past involvement and attempted to locate one of her other children through the child's past caregiver on the date of L.P.'s birth. It also learned of the half-siblings who were adopted in Illinois and Iowa shortly thereafter, but Mom was unable to provide HHS with more specific information. Less than two weeks after L.P. was born, HHS left voicemails for L.P.'s maternal

---

[13]In this same order, the juvenile court criticized HHS for placing L.P. in a nonconcurrent foster home upon removal. Yet, as I mentioned above, the juvenile court allowed the Smiths to intervene and insert themselves as a hopeful concurrent plan for L.P. when they were not even licensed foster parents.

grandmother, the Illinois Department of Children and Family Services, and the past caregiver. It left follow-up voicemails with these three again a week later.

HHS was not merely sitting on its hands in the meantime, as it was eventually able to locate L.P.'s maternal grandmother and the Iowa family that had adopted one of L.P.'s half-siblings (the Olsons). This contact with the Olsons also led HHS to its contact with the Youngs in Illinois. Plus, HHS sought an expedited Interstate Compact on the Placement of Children in Illinois, but Illinois did not accept the expedited request. Ultimately, HHS remained diligent in its attempts to locate and notify relatives of L.P.'s removal. It could only move so fast based on its necessary collaboration with other parties and agencies.

In any event, HHS's inability to quickly notify relatives of L.P.'s removal was not the cause of L.P.'s delay in permanency. That delay falls on the juvenile court, which neglected to follow the appropriate process for modifying a permanency goal from reunification to adoption. It issued multiple continuances to allow the Smiths time to build their case for adoption despite HHS's repeated intent to place L.P. with her half-siblings. It also failed to hold timely hearings to review the progress of reasonable efforts and whether the permanency goal of reunification remained appropriate.

**Permanency:** On January 9, 2025, a little more than a year since L.P.'s CINA adjudication and almost fourteen months after her removal, the juvenile court held its initial (and untimely) permanency hearing in this case.[14] Under Iowa Code section 232.104(1)(*c*), this hearing requires the juvenile court to

---

[14]An untimely permanency hearing may have financial consequences for the child. Title IV-E of the Social Security Act governs the implementation of foster care maintenance payment programs and requires a

> judicial determination that [HHS] has made reasonable efforts to finalize the permanency plan that is in effect . . . within twelve months of the date the child is considered to have entered foster care in accordance with the definition at

consider the child's need for a secure and permanent placement in light of any permanency plan or evidence submitted to the court and the reasonable efforts made concerning the child. Upon completion of the hearing, the court shall enter written findings and make a determination identifying a primary permanency goal for the child. If a permanency plan is in effect at the time of the hearing, the court shall also make a determination as to whether reasonable progress is being made in achieving the permanency goal and complying with the other provisions of that permanency plan.

In its written findings, the juvenile court concluded that "the necessity of removal of the child from the child's home outweighs the potential harm of removal, including but not limited to *the mother's substance abuse and lack of participation in services.*" (Emphasis added.) As I documented above, it is unclear how the juvenile court could have made this finding given the utter absence of any services ordered for Mom in the record. The juvenile court's reference to "substance abuse and lack of participation in services" can only refer to prior CINA cases regarding other children not at issue—not the present CINA case involving L.P. It also used this order to direct the county attorney or the child's attorney to initiate the termination of Mom's parental rights.

**Reasonable Efforts Neither Ordered Nor Waived:** The juvenile court failed to order reasonable efforts and assess whether there was any progress towards reunification of L.P. with Mom—necessary steps before moving from

---

§ 1355.20 of this part, and at least once every twelve months thereafter while the child is in foster care.

45 C.F.R. § 1356.21(b)(2)(i) (2023). Absent this determination "in accordance with [that schedule], the child becomes ineligible under title IV-E at the end of the month in which the judicial determination was required to have been made, and remains ineligible until such a determination is made." *Id.* § 1356.21(b)(2)(ii).

An untimely permanency hearing may also have financial consequences for HHS because the federal government tracks whether "each child in foster care under the supervision of the title IV-E agency has a permanency hearing in a family or juvenile court . . . no later than 12 months from the date the child entered foster care." *Id.* § 1355.34(c)(2)(iii). HHS's failure to substantially conform with this measure can result in the withholding of federal funding on a grander scale. *See generally id.* § 1355.36.

reunification to adoption as a permanency goal. Notably, if the juvenile court believed that no services would make it possible for L.P. to safely return to Mom, it could have waived the reasonable efforts requirement sua sponte or upon motion from a party in the case under Iowa Code section 232.102A. This section provides, "If the court determines by clear and convincing evidence that aggravated circumstances exist supported by written findings of fact based upon evidence in the record, the court may waive the requirement for making reasonable efforts." *Id.* § 232.102A(4). Its list of aggravated circumstances includes some that may have applied here, such as when "[t]he parent has abandoned the child" or "[t]he parent's parental rights have been terminated under section 232.116 . . . with respect to another child who is a member of the same family, and there is clear and convincing evidence to show that the offer or receipt of services would not be likely within a reasonable period of time to correct the conditions which led to the child's removal." *Id.* § 232.102A(4)(*a*), (*c*).

Significantly, this step to waive reasonable efforts would have accelerated permanency. "For [a disposition] order entered under section 232.102, for which the court has waived reasonable efforts requirements under section 232.102, subsection 12, the permanency hearing shall be held within thirty days of the date the requirements were waived." *Id.* at 232.104(1)(*a*)(2). Instead, the juvenile court apparently relied on the much later target date to hold a permanency hearing: "within twelve months of the date the child was removed from the home." *Id.* § 232.104(1)(*a*)(1).

Although we have recognized reasonable efforts include finalizing a timely permanency plan when the child cannot be returned to the parent, this "does not mean that, in any case, [H]HS can fail to deliver reasonable efforts toward reunification where statutorily required or otherwise in the child's best

interests." *In re L.T.*, 924 N.W.2d 521, 529–30 (Iowa 2019). Nevertheless, HHS is not the only party responsible for ensuring reasonable efforts occur. Mom's attorney did little to advocate for reunification services or Mom's interest overall, as she frequently took no position during the various hearings that occurred in this case. *See In re E.E.*, No. 21–0034, 2021 WL 3907807, at *5 (Iowa Ct. App. Sep. 1, 2021) ("A lawyer cannot be half-hearted in applying their energies to a case."). At most, she expressed her discontent to the juvenile court about discovering a potential change in L.P.'s foster care placement through the Smiths' motion to intervene. Beyond that, she "did little to develop any positive aspects of [Mom's] case or redeeming elements that might persuade the court" to order reunification services. *Id.* Similarly, in its haste to identify adoptive placements for L.P., the juvenile court lost sight of its statutory requirement that reasonable efforts towards reunification must precede termination of Mom's parental rights. *See In re B.G.C.*, 496 N.W.2d 239, 241 (Iowa 1992) (en banc) ("Ours is a system of law, and adoptions are solely creatures of statute. . . . [W]ithout established procedures to guide courts in such matters, they would 'be engaged in uncontrolled social engineering.' ").

**Permanency Should Have Come Much Sooner for L.P.:** The juvenile court's decisions to grant the Smiths' motion to intervene and to order an unnecessary attachment assessment—despite HHS's intent to place L.P. with her half-siblings—severely altered the trajectory of this case. Absent these rulings, reunification efforts could have proceeded as intended, and—if unsuccessful—L.P. likely would have achieved permanency before her first birthday following a change of the permanency goal to adoption. *See* Iowa Code § 232.116(1)(*g*) (authorizing termination with no requirement for how long the child has been removed from the parent when the parent has had their rights

terminated to another child and finds clear and convincing evidence of the parent's inability to respond to services to correct the situation).

Instead, the juvenile court cancelled the termination trial to allow for this appeal to proceed. Now, nearly twenty-eight months after L.P.'s removal from Mom's care, the case has been reset to the beginning. This is time that cannot be restored in the life of a young child.

**Conclusion:** The juvenile court had the statutory tools to move this case promptly toward permanency. It should have ordered reasonable efforts and, if unsuccessful at the outset, waived further reasonable efforts. Instead of waiting more than a year after L.P.'s removal from her parents' care, the State would have been authorized to seek a permanency hearing within thirty days of waiver. *See id.* § 232.104(1)(*a*)(2). At that point, the State could have pursued termination of parental rights on the ground that L.P. had been removed from Mom for at least six months during which Mom failed to maintain "significant and meaningful contact" or make reasonable efforts to resume care of L.P. *Id.* § 232.116(1)(*e*)(3). In a case involving an infant, that path would have placed the permanency determination squarely before the court within months of birth— precisely as the statutory scheme contemplates when reunification efforts are deemed futile.

In a case like this, the juvenile court must have sharp elbows to maneuver the process and ensure nothing interferes with reunification efforts. Otherwise, we are left with what happened here: a process that neither pursued reunification with urgency nor advanced permanency with dispatch—leaving L.P. in prolonged uncertainty when the law provided a clear mechanism to avoid it.

I am keenly aware of what our order means in the life of this precious child. And I have no doubt the Smiths love L.P. to the moon and back and have provided her with an exceptional home. But love and stability, however genuine, cannot replace the process our law requires to protect a parent's fundamental liberty interest "in the care, custody, and control of their children." *G.Y.*, 968 N.W.2d at 894 (quoting *Troxel*, 530 U.S. at 65). Mom was never given a chance to demonstrate her ability to change. Based on my experience with thousands of families over decades of work in juvenile court, I harbor serious doubts that such a change will ultimately occur in a way that would prevent termination of parental rights. But she deserves—and is legally entitled to—a meaningful opportunity to try.